# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 3:19-CR-00064 (VLB) |
| Plaintiff, | ) ) | SENTENCING MEMORANDUM ON BEHALF OF RAMEL GENERAL |
| Vs. | ) ) | |
| RAMEL GENERAL, | ) ) | |
| Defendant | ) ) | |
| _____ | ) | |

The Defendant, RAMEL GENERAL, respectfully files this sentencing memorandum as an aid to the Court regarding his sentencing, which is scheduled for July 29, 2020.[1]

A sentence must be no longer than necessary to further the purposes of United States Code (USC), Section 3553(a).  In that regard, the defendant requests that this court consider a departure, a "non-Guideline" sentence or a sentence at the low end of the Guideline sentencing range.

The Guidelines are no longer binding and mandatory considering <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), and <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).

---

[1] This sentencing memorandum is being filed without attachments. Defense counsel filed a Motion to Seal the attachments, which is pending. Once the Court acts on the Motion to Seal, defense counsel will file the documents referenced in the body of this memorandum.

Each factor set forth in the USC, Sec. 3553 (a) and the Guidelines should be considered by this Court. No one factor within the USC, Sec. 3553 (a) is elevated to presumptively controlling weight. The Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." <u>Crosby</u>, 397 F.3d at 113-14.  However, they are not the controlling factor, more important than all - or any - of the other factors listed in USC, Sec. 3553(a). After considering the Guidelines, the sentencing judge may impose either a Guidelines sentence, including one considering departures, or a "non-Guidelines" sentence. Id. at 113.

This case, at least as to this defendant, sets forth an apparent reason to grant a departure, impose a "non-Guideline" sentence or a Guideline sentence at the low end of the sentencing range considering the factors in the USC, Sec. 3553 (a).

Section 3553(a) requires the court to impose a sentence "sufficient, but not greater than necessary," to promote the purposes of fair sentencing. Under <u>Booker</u>, "[s] ection 3553(a) remains in effect, and sets forth numerous factors that guide sentencing." <u>Booker</u>, 125 S. Ct. at 766.  Those factors include:

1.  the nature and circumstances of the offense and the history and characteristics of the defendant.

2.  the need for the sentence imposed-

    a.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
    b.  to afford adequate deterrence to criminal conduct.
    c.  to protect the public from further crimes of the defendant; and
    d.  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3.  the kinds of sentences available.

4.  the kinds of sentence and the sentencing range established for-

    a.  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

       i.  issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28); and

      ii.  that, except as provided in section 3742(g) are in effect on the date the defendant is sentenced; or

    b.  in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28);

5.  any pertinent policy statement-

    a.  issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28); and

    b.  that, except as provided in section 3742(g) is in effect on the date the defendant is sentenced.

6.  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.  the need to provide restitution to any victims of the offense.

The court in <u>Crosby</u> declined to define how a district judge is to "consider" the Guidelines.  Nothing in either <u>Crosby</u> or <u>Booker</u> suggests that a Guidelines range, once it is found, is to be presumptively considered "reasonable" or a default position. Although the court cautioned that judges should continue to "reduce unwarranted disparities," they should now be able to achieve "more individualized justice." <u>Crosby</u>, 397 F.3d at 113- 14.  "In short, there need be no 'fear of judging'." *Id.*

Since the Guidelines are no longer mandatory, district courts must consider the policy choices made by the Sentencing Commission in arriving at the Guidelines range for a case, but the judge is also free to disagree with those policy choices under the circumstances of the case, even if those circumstances are no longer "atypical" or "outside the heartland."  "The Guidelines . . . are the product of policy decisions by the Sentencing Commission . . . If those policy decisions are no longer mandatory, the sentencing judge is free to disagree with them."  <u>Booker</u>, 125 S. Ct. at 790 n.3 (Scalia, J., dissenting).

With these standards in mind, let us turn to this case.

1.    The nature and circumstances of the offense and the history and characteristics of the defendant.

A.    <u>The Nature & Circumstances of the Offense</u>:

The government's version of Offense Conduct was contained in paragraphs 11 through 29 of the PSR.  Mr. General conspired to distribute cocaine with Anthony

Whyte and other defendants listed in the Second Superseding Indictment. Mr. General was arrested by federal agents on February 26, 2019 without incident.

Mr. General accepted responsibility for his conduct. In paragraph 32 of the PSR, Mr. General acknowledged the essential elements of the offense.

Mr. General's Offense Conduct was serious; however, the "why" of how he got to the psychological place to engage in the Offense Conduct may be explained by the "Results of Court-Related Psychological Evaluation" prepared by James Joseph Connolly, Ph.D. at the request of Mr. General's state public defender as part of a case pending in New London Superior Court.[2] Dr. Connolly diagnosed Mr. General with a severe Alcohol Disorder and a Polysubstance Abuse Disorder as well as a severe personality disorder, probable PTSD and depressive mood disorder.

In addition, Mr. General was shot three times at a public housing project in New London during July 2012.[3] . The experience exacerbated Mr. General's feelings of apprehensiveness, depression, and suspicion. Mr. General coped with the shooting by increasing his use of alcohol.

The factors mentioned above may provide this Court with a better understanding as to Mr. General's background as well as present this Court with mitigating factors to consider when imposing sentence.

---

[2] A copy of Dr. Connolly's "Results of Court-Related Psychological Evaluation" is attached as an exhibit.

[3] A copy of July 6, 2012 medical records documenting the shooting is attached as an exhibit. Defense counsel attached copies of the hospital cover sheet, discharge instructions and ER report. Defense counsel can produce the entire July 6, 2012 medical record if deemed necessary by this Court.

B.    __The History & Characteristics of the Defendant__:

USPO Collette and USPO Murphy summarized the history and characteristics of Mr. General in the "Offender Characteristics" portion of the PSR from paragraphs 62-92.

__Childhood__:    Mr. General's childhood is notable because of the lack of any genuine relationship he had with his father. Mr. General resided in public housing with his parents until his mother kicked out the father. Mr. General's father was addicted to crack. Mr. General's father routinely physically abused Mr. General's mother.

Mr. General was born in New London and attended New London schools. Mr. General experienced behavioral difficulties in school. Mr. General was placed in special education classes. Mr. General recalled being diagnosed with ADHD and "behavior problems" while in school. At one point during his adolescence, Mr. General was placed in a special residential school for about three years. The school, Founder School, operated in East Haddam, Connecticut from 1992 to 1998.[4]

In addition, Mr. General, as a youth, received in-patient psychiatric treatment for about three weeks at the Elmcrest Psychiatric Hospital in Portland, Connecticut. Mr. General recollected that he resisted taking Ritalin, which was prescribed for him. Mr. General recollected that he felt depressed and behaviorally out of control just before admission to Elmcrest.

---

[4] This placement made Ramel feel as though everyone, including his mother, was giving up on him. Ramel felt as though no one advocated for him. Ramel was sidelined from public school and his friends. The placement made Ramel feel as though he was "different" and "less than".

**Personal Relationships**.

Mr. General is not married. However, Mr. General has a long-term relationship with Jessica Bonelli of Groton, Connecticut. The couple has two children together. In addition, Ms. Bonelli has two other children.

The children in Ms. Bonelli's household include Zymel, who has been diagnosed with high functioning autism as well as ADHD. Another child, Cameron, has been diagnosed with severe autism, non-verbal. According to Ms. Bonelli, Zymel is a teenager who does not have too many friends. Ms. Bonelli believes that Zymel receives emotional support from Mr. General's physical presence. Cameron is non-verbal. However, Ms. Bonelli believes that Cameron smiles and laughs when he and Mr. General are together. Once again, Ms. Bonelli believes that Mr. General's physical presence provides a huge emotional support for Cameron. In addition, Mr. General's daughter, Jayleeani, and Kaylona, reside in Ms. Bonelli's household.

**Physical Condition, Mental/Emotional Health & Substance Abuse**.  As stated previously, Mr. General was shot and hit with three bullets in New London during July 2012.[5]  After the shooting, Mr. General became paranoid and anxious. His use of alcohol increased substantially. In the aftermath of the 2012 shooting, Mr. General was prescribed Percocet/Vicodin for pain.[6] Mr. General used the Percocet/Vicodin as

---

[5] Survivors of gunshot wounds reported worse physical and mental health compared with the general population and had positive screen findings for probable PTSD, unemployment, and substance abuse after injury. See, "Long-term Functional, Psychological, Emotional and Social Outcomes in Survivors of Firearm Injuries", JAMA Surg. 2020; 155(1):51-59. Doi:10.1001/jamasurg.2019.4533.

[6] Mr. General received treatment for the pain associated with the July 6, 2012 shooting on July 10, July 18, and August 22, 2012.

prescribed. However, when the prescription expired, Mr. General obtained illegal supplies of the drug. As a matter of fact, Mr. General was using Percocet when he was arrested in the instant case. Mr. General used Percocet daily. If Mr. General did not have Percocet, then he would become physically ill.

In addition to Percocet, Mr. General used PCP heavily as a young adult as well as cannabis. However, his drug of choice was alcohol.

To date, Mr. General's coping skills with life's challenges have been reduced to anesthetizing his feelings with drugs and alcohol. Mr. General will benefit from substance abuse treatment while with the FBOP and post-incarceration.[7]

<u>Education/Vocational & Employment Record</u>: Mr. General's education record from New London schools revealed some of the struggles Mr. General faced as a youth. For example, as a fourth-grade student at Winthrop School, Ramel scored below the remedial standard in writing and demonstrated weakness in the areas of Organization and Support/Elaboration. Also, he scored below the remedial standard in reading and mathematics.[8] As a sixth-grade student at Bennie Dover Jackson School, Ramel scored slightly below the statewide goal for writing. He did not even attempt the Reading Test. Also, he scored below the statewide goal for mathematics.[9]

Ramel's Progress Reports from Kindergarten through Grade Five revealed some

---

[7] See, Mr. General's Addiction Services Inmate Program Participation Report dated 10/17/19 from Corrigan Correctional Center.

[8] See, Connecticut Mastery Testing Program Grade 4 Report.

[9] See, Connecticut Mastery Testing Program Grade 6 Report.

successes as well as some challenges.[10] For example, the Kindergarten Progress Report contained comments from his teacher that "Ramel has demonstrated improvement throughout the school year." The teacher noted that Ramel should continue to review his upper- and lower-case letters as well as numerals 1-20.

Ramel's Progress Report for Grade One contained teacher comments, such as "Ramel tries very hard to complete all assignments. He has difficulty in Reading and Phonics".

The Progress Report for Grade Two included teacher comments that Ramel showed improvement in his work habits, his reading and creative writing. However, the teacher noted that Ramel's behavior was sometimes defiant. He had difficulty getting along with his classmates.

The Progress Report for Grade Three contained teacher comments that Ramel made excellent progress in reading and social behavior. The teacher noted that Ramel was diligent about his work and was helpful in class.

The Progress Report for Grade Four contained teacher comments that Ramel's skills in English, spelling, social studies, science, and mathematics were below grade level. As a result, the teacher recommended that Ramel be retained in 4th grade in September. The teacher also commented that Ramel's "erratic behavior very often interfered with the learning process."

The Progress Report for a "repeated" Grade Four contained teacher comments

---

[10] See, Ramel's Progress Reports from Kindergarten to Grade Five.

that Ramel was trying but, in some areas, more effort was needed. The teacher noted that Ramel showed slow improvement in Social Development.

The Progress Report for Grade Five contained teacher comments that Ramel made a particularly good effort to improve his attitude. He was "very cooperative" in the classroom and worked responsibly. However, the teacher noted that Ramel got into trouble outside the classroom, e.g. cafeteria and playground. In addition, the teacher commented that when Ramel lost his self-control in dealing with others, his attitude affected his schoolwork. The teacher recommended that Ramel work on holding his temper so he could put more energy into schoolwork.

Despite some successes, Ramel's early education experiences were struggles with reading, writing and mathematics. These struggles resulted in frustration and feelings of "not fitting in" or "not being good enough". Ramel coped with these struggles by acting out.

Mr. General obtained his GED during 2009 while incarcerated in the Connecticut Department of Corrections.

Mr. General's employment record consists of employment with PCC Structurals, Inc. of Groton where Mr. General worked as a Finisher from September 29, 2014 through January 30, 2015. In addition to PCC Structurals, Inc., Mr. General worked at Henny Penny in Groton. Mr. General also obtained employment through temp agencies, such as, Staffing Source, Inc. of New London and Temporaries of New England, Inc. of New London.

Mr. General will benefit from vocational skills training while incarcerated with

the FBOP and post-incarceration.

**2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

First, what is the need to "protect the public from further crimes of the defendant"? The court has an obligation to consider "the nature and circumstances of the offense and the history and characteristics" of the defendant when imposing a sentence, including the risk of recidivism.

Let us look at some of the factors supporting a variance and/or departure from the Guidelines such as Mr. General's criminal history, the deficiencies of imprisonment, age, family ties, childhood lack of guidance and pretrial conditions of confinement as these factors relate to the purpose of sentencing and the low risk of recidivism.

<u>Criminal history guidelines improperly inflate sentence</u>:

U.S.S.G. 4A1.3 (b) (1) states "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."

The PSR references two Operating under the Influence convictions at paragraphs 55 & 56. There is no question that OUI is a serious offense and that the offense is counted in the criminal history pursuant to U.S.S.G. sec. 4A1.2, Application Note 5. However, OUIs are usually a strong indicator of a significant alcohol problem.

Dr. Connolly opined that Mr. General suffers from a severe Alcohol Use Disorder and Polysubstance Abuse Disorder. To the extent that alcoholism is considered a disease, then treatment and recovery should be emphasized over punishment. The two OUI convictions mark Mr. General's Criminal History score at VI. However, a view of Mr. General's Criminal History that considers alcoholism as a disease may support subtracting the four points for the OUI convictions, assess nine points and set Mr. General's Criminal History score at IV.

Deficiencies of imprisonment: A longer sentence would impair defendant's rehabilitation. See Gall v. U.S., 128 S. Ct. 586, 593 (2007). Dr. Connolly opines that Mr. General's combination of substance abuse, personality disorder and probable PTSD requires serious professional treatment. The FBOP may provide some of these treatments. However, the quality of treatments may improve post-incarceration. Dr. Connolly stresses "serious professional treatment" for Mr. General. The counter-effective result of a lengthy imprisonment would be to retard Mr. General's rehabilitation.

In contrast, drug rehabilitation reduces recidivism U.S. v. Perella, 273 F.Supp.2d 162, 164 (D. Mass. 2003) (observing that if drug addiction creates a propensity to crime, drug rehabilitation goes a long way to preventing recidivism. Statistics suggest recidivism rate is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of prison setting, citing Lisa Rosenblum, Mandating Effective Treatment for Drug Offenders, 53 Hastings L.J. 1217, 1220 (2002).

In the instant case, this Court may want to consider a departure or a variance

to allow for community treatment options for Mr. General's drug or alcohol dependence for any sentence of imprisonment more than 60 months. See, U.S.S.G. §5C1.1, Application Notes 7 & 10 ("a downward departure may be appropriate to accomplish a specific treatment purpose.")

Age: Mr. General will be significantly older upon release from a sentence of imprisonment. See, United States v. Carmona-Rodriguez, 2005 U.S. Dist. LEXIS 6254, at *10-11 (S.D.N.Y., Apr. 11, 2005) (Sweet, J). Age upon release is a strong predictor of future criminal activity. See, United States v. Simon, 361 F. Supp. 2d 35 at 43; United States v. Nellum, 2005 U.S. Dist. LEXIS 1568, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005). Increased age bears a strong correlation with lower recidivism. According to Sentencing Commission data, "recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50. USSC, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12 and Exhibit 9 (May 2004). The U.S. Parole Commission has long included age as part of its Salient Factor Score because it is a validated predictor of recidivism risk. USSC, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, at 1, 8 & n.29 (Jan. 2005). Although the Commission has not modified the guidelines to take this data into account, courts are now free to rely on this data to vary from a guideline when the defendant's age predicts a reduced likelihood of recidivism. For example, Courts have cited such data in imposing below Guideline sentences. See, e.g., Gall v. United States, 128 S.Ct. 586, 601 (2008) (approving district court's use of studies to bolster

conclusion that defendant's youth at time of crime supported below-guideline sentence); <u>United States v. Hamilton</u>, 323 Fed. Appx. 27(2d Cir. 2009)(remanding for resentencing where district court may not have understood that it had discretion to disagree with "Guidelines' refusal to consider age and its correlation with recidivism"); <u>United States v. Martinez</u>, 2007 WL 593629 (D. Kan. Feb. 21, 2007) (unpub) (notifying counsel considering non-guideline sentence based, in part, on defendant's age, referencing recidivism reports showing increased age and first offender status show decreased likelihood of recidivism); <u>United States v. Ruiz</u>, 2006 WL 1311982 (S.D.N.Y. May 10, 2006) (unpub) (noting several courts have imposed non-guideline sentences for defendants over 40 based on markedly reduced recidivism, citing recidivism study).

At the time of sentencing, Mr. General will be 38 years old. If the court imposes a non-Guideline sentence of 60 months, Mr. General will be 43 years old upon release. It is anticipated that Mr. General will benefit from programs offered by the FBOP including vocational training, mental health treatment and substance abuse treatment[11]. In addition, it is anticipated that Mr. General will benefit from these types of programs post-incarceration. Given Mr. General's current age and exposure to these programs, it is more probable than not that Mr. General will show a decreased likelihood of recidivism. As a matter of fact, a 60-month non-guideline sentence will permit Mr. General the opportunity to start over at a relatively productive age so that he can become a contributing member of the community.

---

[11] It is defense counsel's understanding that the FBOP has suspended its 500-hour substance abuse treatment program for a period.

**Family Ties**: Fathers who maintain relationships with children are less likely to recidivate. *Solangel Maldonado, Recidivism and Parental Engagement*, 40 Family L. Q. 191 (2006) ("The literature ... suggests that ex-convicts who share close relationships with their children are less likely to recidivate than those who do not."). "The single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties." Id. at 196-97.

In the instant case, Mr. General is blessed with the support of his mother, father, and others. The close relationship Mr. General shares with his children and Ms. Bonelli's children bodes well against recidivism. Both Ms. Bonelli and Mr. General's father have expressed how important Mr. General is in the lives of the children. A lengthy incarceration would have a harsh effect on innocent family members.

**Disadvantaged childhood, victimization, lack of guidance as a youth**: USSG. §§ 5H1.12 and 5K2.0 (d) (1) treat lack of guidance as a youth and "circumstances indicating a disadvantaged upbringing" as forbidden departure grounds. *Booker* and its progeny free district courts to consider these factors as part of their analysis under §3553(a). For example, see, *U.S. v. Ruiz*, 2009 WL 636543 (S.D. N.Y., March 11, 2009) (judge imposed 96 months rather than guideline range of 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict, and the absence of any prior substance abuse assistance); *U.S. v. Samuels*, 2009 WL 875320 (S.D. N.Y. April 2,

2009) (time served imposed rather than guideline range of 70-87months for young woman from abused background who was embarrassed by her drug sales and did not tell her family though she sold them to support them); *U.S. v. Handy*, 2008 WL 3049899 (E.D.N.Y. 2008) (court imposed 30 month sentence rather than guideline range of 37-46 months for 20-year-old whose life story read like it came from "the feeder systems into the Cradle to Prison Pipeline": abandoned as an infant, separated from siblings, raised by aunt in high crime area, shot on the street at age 12, left school and took up crime at age 14, spent the majority of his adolescence in prison, prosecuted for possessing a gun he found and believed to be inoperable in an environment where finding a gun on the street is like finding cash); *U.S. v. Santa*, 2008 WL 2065560 (E.D. N.Y. 2008) (court imposed 120 months as a variance from a guideline term of 262-327 months for a mentally ill defendant's difficult childhood and life: delivered as an infant by his heroin-addicted mother and abandoned by his father at age 4, his difficulties were exacerbated by his resort to drugs to overcome emotional trauma from his separation from his girlfriend and the mother of his children).

In the instant case, Mr. General's father was not present in his life as a child. Mr. General's father was addicted to crack. He routinely physically abused Mr. General's mother. Finally, Mr. General's father left the family home.

Fathers are important in the development of a child. Without a father figure to guide him, Mr. General navigated his childhood and beyond with only one parent, his mother.

Mr. General's experiences in school were "demeaning and humiliating". As a

special education student, Mr. General was not allowed to remain on high school property for lunch time. He missed out on eating lunch with the other students. Mr. General stayed back and repeated Fourth Grade. Such experiences provoked feelings of "not fitting in". That is why Mr. General described himself as a "people pleaser". One who seeks validation from others.  One who is unable to self-validate because of diminished feelings of self-worth.

Mr. General requests that, at sentencing, this Court consider Mr. General's lack of guidance from his father as a youth as well as his education background to assess whether these factors constitute mitigating factors.

<u>Pretrial Conditions of Confinement</u>: The federal sentencing guidelines allow a district court to take into consideration substandard conditions of pretrial confinement. A reduced sentence may be necessary to serve as "a statement that there is a law at reason and fairness behind detention." See: <u>United States v. Sutton</u>, U.S.D.C. (D. N.J.), Case No. 2:07-cr-426-KSH; 2007 U.S. Dist. LEXIS 79518 (Oct. 25, 2007).

In the instant case, Mr. General was detained by the State of Connecticut from approximately May 27, 2019 to the present. Mr. General started out in Corrigan Correctional Center before he was moved to the Hartford Correctional Center sometime in February 2020. While at HCC, Mr. General had to endure the threat of COVID-19 as part of his pretrial confinement. Thus, this court should consider ordering a sentence variance and reduce Mr. General's sentence by at least five months to account for the pretrial conditions of confinement.

**Rehabilitation:**   Pursuant to Section 3553, this court must consider the factor of rehabilitation. Stated simply, a Guideline sentence in this case gives short shrift to the statutorily mandated purpose of sentencing, namely rehabilitation.  As stated by Judge Hellerstein:

> Rehabilitation is also a goal of sentencing. 18 U.S.C. Sections 3553(a) (2) (D).  That goal cannot be served if a defendant can look forward to nothing beyond imprisonment.  Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

Carvajal, 2005 U.S. Dist. LEXIS 3076, at *15-16.

In the instant case, Mr. General actively participated in the Addiction Services Inmate Program at Corrigan Correctional Center. See, footnote #7, supra. In addition, he made a request to be placed on the list for AA Fellowship meetings. These actions are indicators that Mr. General acknowledges his addictions. Such acknowledgement is the first step for recovery and rehabilitation.

**General Deterrence:** The consideration of general deterrence, required under Section 3553(a)(2)(B), mandates that the Court consider the extent to which similarly situated potential offenders will be deterred from committing similar crimes by whatever sentence the Court imposes in this case. This is, however, a highly unpredictable exercise: it assumes that a person in defendant's position considering whether to commit a crime weighs the consequences of getting caught and further weighs the benefits against the incremental risks of prison sentences of terms. However, most persons would not commit the crime at all if they thought that they

would be caught, regardless of the punishment Further, it is impossible to conclude that somewhere along the range of "just" punishments there is a tipping point, a point beyond which a rational potential offender will conclude not to become involved in that offense due to the sentence for this offense.

"The certainty of being caught is a vastly more powerful deterrent than the punishment." National Institute of Justice, Five Things about Deterrence (Sept. 2014) http://www.nij.gov/five-things/pages/deterrence.aspx. "Sending an offender to prison isn't a very effective way to deter crime." https://ncjrs.gov/pdffiles1/nij/247350.pdf. Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crimes. Prisons actually may have the opposite effect." Id.

"[T] here is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs." *Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013).* "[L] engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis." Id. at 202. "[E] vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment . . . The evidence in support of certainty's deterrent effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective

deterrent. Thus, this revised conclusion about the deterrent effect of punishment certainly should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects." Id. at 201-202.

In the case at bar, there is no evidence that sentencing Mr. General within the Guideline range will yield a general deterrent effect. Instead, the fact that Mr. General was apprehended and prosecuted will yield a far greater general deterrent effect than any lengthy prison sentence.

<u>Specific Deterrence</u>: As for specific deterrence, "[t]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation." *Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013).*

"[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect." Ellen Raaijmakers et al., Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory, 54 J. of Research in Crime and Delinquency 1, 4 (2017).

In the case at bar, the imprisonment of Mr. General will remove him from society for a period. However, a sentence that emphasizes rehabilitation and de-emphasizes time in prison will produce the specific deterrence contemplated by Section 3553 because rehabilitation will get at the root cause of Ramel's behavior and help him to recover.

3. The kinds of sentences available and 4. Sentencing Guidelines range.

This subject matter has already been discussed. See, USPO Murphy's analysis at PSR, paragraphs 93-106.

In United States v. Ranum, 353 F. Supp. 2d 984, 986 (B.D. Wis. 2005), Judge Adelman concluded that the Guidelines are not presumptive, but are truly advisory, and should be treated as one factor to be considered in conjunction with other factors that Congress enumerated in § 3553(a). Judge Pratt followed Ranum in United States v. Myers, 353 F. Supp. 2d 1026, 1029-30 (S.D. Iowa 2005):

> At first blush, a system of discretionary sentencing would appear to invite what Congress hoped to avoid, unfairness at sentencing. The Supreme Court in Booker, however, reminded judges and the public that true uniformity exists not in a one-size-fits-all scheme, but in "similar relationships between sentence and real conduct." 125 S. Ct. 738, at 21. This is the guiding principle at work in Booker. This Court will endeavor, then, to square the real conduct presented by the evidence presented concerning a defendant, with the public interests expressed through the sentencing statute, to deliver a judgment in a manner as even-handed and reasonable as humanly possible.

Id. See also, United States v. West, 2005 U.S. Dist. LEXIS 1123, at *6-*7 (S.D.N.Y. Jan. 27, 2005) (Sweet, J.) ("The Guidelines calculations are to be treated 'as just one of a number of sentencing factors' in part because several of the factors identified in Section 3553(a) conflict with prescriptions and proscriptions of Guidelines, and that such conflicts will require resolution by district courts"); United States v. Jones, 352 F. Supp. 2d 22,26 (D. Me. 2005) (reviewing factors identified in Section 3553(a) "in determining whether to apply the now advisory Guidelines" and concluding that Guidelines would not be followed under the circumstances); United States v. Jaber, 362 F. Supp. 2d 365 (D. Mass. 2005); United States v. Moreland, 2005 U.S. Dist. LEXIS 7393, at *3-*4 (S.D.W. Va. Apr. 27, 2005); Simon v. United States, 361 F. Supp. 2d 35,

40 {S.D.N.Y. 2005) {Sifton, J.) ("I adopt the view that the Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by Section 3553{a), in part because Section 3555(a) does not distinguish between the weight to be given to any of the factors listed, so that giving 'heavy' weight to the Guidelines may therefore be in tension, if not conflict, with Section 3553(a)'s command to consider a multitude of factors").

### 5. Policy Statements.

Any policy statements that the Court should consider relating to this case are contained within the content of this memorandum.

### 6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

This factor would seem difficult to apply in the abstract and separate from the other factors. If the Court is faithfully applying the Section 3553(a) factors, then sentence disparity should be reduced.

### 7. Restitution.

Restitution does not appear to be applicable in this case.

## CONCLUSION

It is respectfully requested that this Court sentence Mr. General to a term of imprisonment that is "no more than necessary" to further the principles set forth in § 3553(a). Mr. General requests that this Court emphasize the need for rehabilitation rather than punishment by way of a lengthy incarceration. Mr. General requests that the Court consider a sentence of imprisonment of 60 months together with a 5-year period of supervised release. When imposing a sentence of imprisonment, Mr. General requests that this Court consider the SUGGESTED BUREAU OF PRISONS PROGRAMMING identified by USPO Murphy and that this Court recommend placement in the FBOP's Substance Abuse Program as well as the Special Conditions during post-conviction supervision. In addition, Mr. General requests that this Court recommend to the FBOP a designation to a facility as close as possible to Connecticut and to Mr. General's family. Finally, Mr. General requests that this Court consider crediting Mr. General the time he has remained in pretrial detention while in state custody, namely from May 27, 2019 through the present.

Respectfully Submitted,

DEFENDANT, RAMEL GENERAL,

By: */s/ David J. Wenc*

David J. Wenc
Baram, Tapper & Gans, LLC
Three Regency Drive
Bloomfield, CT 06002
Tel. (860) 242-2221
Fax: (860) 286-0185
Federal Bar#:  CT 00089
DWenc@ctattys.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2020, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing including the individuals listed below.  Parties may access this filing through the Court's CM/ECF System.

By: */s/ David J. Wenc*

David J. Wenc
Baram, Tapper & Gans, LLC
Three Regency Drive
Bloomfield, CT 06002
Tel. (860) 242-2221
Fax: (860) 286-0185
Federal Bar#:  CT 00089
DWenc@ctattys.com